PUBLIC REDACTED

No. 18-2852

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

VIAMEDIA, INC.,

*Plaintiff-Appellant,*

v.

COMCAST CORPORATION and COMCAST CABLE
COMMUNICATIONS MANAGEMENT, LLC,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 1:16-cv-05486

The Honorable Amy J. St. Eve, Circuit Judge (Sitting by Designation)

**BRIEF OF DEFENDANTS-APPELLEES COMCAST CORPORATION AND
COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC**

Ross B. Bricker
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
rbricker@jenner.com

Arthur J. Burke (*Counsel of Record*)
David B. Toscano
Christopher P. Lynch
John M. Briggs
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Arthur.Burke@davispolk.com
David.Toscano@davispolk.com
Christopher.Lynch@davispolk.com
John.Briggs@davispolk.com

*Attorneys for Defendants-Appellees
Comcast Corporation and Comcast Cable
Communications Management, LLC*

December 10, 2018

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-2852

Short Caption: Viamedia, Inc. v. Comcast Corporation, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> **[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Comcast Corporation

Comcast Cable Communications Management, LLC (successor to Comcast Spotlight, LP) ("CCCM")

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Davis Polk & Wardwell LLP

Jenner & Block LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

Comcast Corp. has no parent corporations; CCCM is 100% indirectly owned by Comcast Corp.

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/  Arthur J. Burke        Date: December 10, 2018

Attorney's Printed Name: Arthur J. Burke

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☒  **No** _____

Address: Davis Polk & Wardwell LLP

450 Lexington Avenue, New York, New York 10017

Phone Number: 212-450-4352        Fax Number: 212-701-5352

E Mail Address: arthur.burke@davispolk.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-2852

Short Caption: Viamedia, Inc. v. Comcast Corporation, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Comcast Corporation

Comcast Cable Communications Management, LLC (successor to Comcast Spotlight, LP) ("CCCM")

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Davis Polk & Wardwell LLP

Jenner & Block LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

Comcast Corp. has no parent corporations; CCCM is 100% indirectly owned by Comcast Corp.

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/ David B. Toscano          Date: December 10, 2018

Attorney's Printed Name: David B. Toscano

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address: Davis Polk & Wardwell LLP

450 Lexington Avenue, New York, New York 10017

Phone Number: 212-450-4515          Fax Number: 212-701-5515

E Mail Address: david.toscano@davispolk.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-2852

Short Caption: Viamedia, Inc. v. Comcast Corporation, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[  ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Comcast Corporation

   Comcast Cable Communications Management, LLC (successor to Comcast Spotlight, LP) ("CCCM")

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Davis Polk & Wardwell LLP

   Jenner & Block LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      Comcast Corp. has no parent corporations; CCCM is 100% indirectly owned by Comcast Corp.

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature:  s/  Christopher Lynch          Date:  December 10, 2018

Attorney's Printed Name:  Christopher Lynch

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ✕

Address:  Davis Polk & Wardwell LLP

      450 Lexington Avenue, New York, New York 10017

Phone Number:  212-450-4034          Fax Number:  212-701-5034

E Mail Address:  christopher.lynch@davispolk.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-2852

Short Caption: Viamedia, Inc. v. Comcast Corporation, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Comcast Corporation

Comcast Cable Communications Management, LLC (successor to Comcast Spotlight, LP) ("CCCM")

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Davis Polk & Wardwell LLP

Jenner & Block LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

   Comcast Corp. has no parent corporations; CCCM is 100% indirectly owned by Comcast Corp.

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

   N/A

Attorney's Signature:  s/  John M. Briggs                    Date:  December 10, 2018

Attorney's Printed Name:  John M. Briggs

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address:  Davis Polk & Wardwell LLP

450 Lexington Avenue, New York, New York 10017

Phone Number:  212-450-3292                 Fax Number:  212-701-6292

E Mail Address:  john.briggs@davispolk.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-2852

Short Caption: Viamedia, Inc. v. Comcast Corporation, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [✔]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Comcast Corporation

    Comcast Cable Communications Management, LLC (successor to Comcast Spotlight, LP) ("CCCM")

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Davis Polk & Wardwell LLP

    Jenner & Block LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

        Comcast Corp. has no parent corporations; CCCM is 100% indirectly owned by Comcast Corp.

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

        N/A

Attorney's Signature:  s/  Ross B. Bricker      Date: December 10, 2018

Attorney's Printed Name: Ross B. Bricker

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** \_\_\_\_\_   **No** ✗ (new)

Address: Jenner & Block LLP

        353 N. Clark St., Chicago, IL 60654

Phone Number: 312-222-9350      Fax Number: 312-527-0484

E Mail Address: rbricker@jenner.com

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................... iv

JURISDICTIONAL STATEMENT ...................................................... 1

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF THE ISSUES ......................................................... 5

STATEMENT OF THE CASE............................................................. 6

A.   Allegations of the Amended Complaint ...................................... 6

    1.   Spot Cable Advertising ................................................. 6

    2.   Interconnects ............................................................. 6

    3.   The Alleged Refusal to Deal............................................ 7

B.   Undisputed Facts ................................................................ 8

    1.   Spot Cable Advertising Representation ............................... 9

    2.   The 2003 Agreement between Comcast and Viamedia ........... 9

    3.   Competition to Represent MVPDs.................................... 10

    4.   Comcast's Alleged Tying ............................................. 11

C.   Viamedia's Claims and Proffered Expert Opinions...................... 12

D.   The District Court's Challenged Rulings .................................. 13

    1.   Dismissal of Viamedia's
        Refusal to Deal Theory on the Pleadings ............................ 13

    2.   Summary Judgment Dismissing
        Viamedia's Remaining Antitrust Theories........................... 15

    3.   Exclusion of Viamedia's
        Expert Testimony under *Daubert*...................................... 17

SUMMARY OF THE ARGUMENT ................................................... 17

STANDARD OF REVIEW ............................................................... 19

ARGUMENT ................................................................................................ 21

I.    The District Court Properly Dismissed
      Viamedia's Refusal to Deal Theory on the Pleadings ..................... 21

      A.    Antitrust Liability for a Unilateral
            Refusal to Deal Is Strongly Disfavored ............................... 21

      B.    The District Court Properly
            Applied the "Irrational but for
            Its Anticompetitive Effect" Standard .................................. 23

      C.    The District Court Correctly Dismissed
            Viamedia's Refusal to Deal Theory Based on
            Allegations Showing Comcast's Valid Business Purpose ............ 26

      D.    Viamedia Advances No Valid Basis
            To Reverse the District Court's Decision ............................. 28

            1.    Viamedia's Arguments Based on the
                  Timing of Comcast's Actions Lack Merit ..................... 28

            2.    Viamedia's Arguments Raised for the
                  First Time on Appeal Are Also Meritless .................... 31

      E.    Viamedia's Allegations Establish
            Additional Grounds for Dismissal ....................................... 35

II.   The District Court Properly Granted
      Summary Judgment Rejecting Viamedia's Tying Theory ................... 36

      A.    The District Court Correctly Held that There
            Was No Unlawful Coercion as a Matter of Law ..................... 37

            1.    Undisputed Evidence of Comcast's Unbundled Sales
                  Shows, as a Matter of Law, that There Was No Forcing ......... 37

            2.    WOW!'s and RCN's Purchases of the Tying and
                  Tied Products from Comcast Did Not Entail Forcing ............. 38

            3.    Comcast's Alleged Refusal to Allow Viamedia's Clients
                  To "Participate in Interconnects" Did Not Entail Forcing ........ 39

            4.    Viamedia Failed to Proffer
                  Evidence Probative of Forcing .................................... 43

B.     The Absence of Foreclosure Is, as a Matter
Of Law, Fatal to Viamedia's Tying Theory ........................................ 46

III.    Viamedia Lacks a Viable "Free-Standing" Section 2 Claim ........................... 48

IV.    The District Court Properly Held that There Was No Evidence that
Any Anticompetitive Conduct Caused Antitrust Injury or Damages ............ 50

A.     Viamedia Cannot Establish Antitrust Injury because
Its Harm Flowed from Comcast's Lawful Refusal to Deal ................ 50

B.     Viamedia's Inability to Compete with
Comcast Cannot Cause Antitrust Injury ............................................. 52

C.     Viamedia Cannot Establish Cognizable Damages
Because It Failed to Isolate the Effect of Unlawful Conduct ............. 53

V.     The District Court Did Not Abuse Its
Discretion by Excluding Viamedia's Proffered Experts ................................. 54

A.     The District Court Properly
Excluded Lys's Opinions ..................................................................... 54

B.     The District Court Properly
Excluded Furchtgott-Roth's Opinions ................................................ 56

CONCLUSION .......................................................................................................... 57

CERTIFICATE OF COMPLIANCE ....................................................................... 58

CERTIFICATE OF SERVICE ................................................................................. 59

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
 836 F.3d 1171 (9th Cir. 2016) ............................................................... 34, 41

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ............................................................................... 20

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ............................................................................... 19

*Ask Chems. LP v. Comput. Packages, Inc.,*
 593 F. App'x 506 (6th Cir. 2014) .......................................................... 55

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
 472 U.S. 585 (1985) .................................................................... *passim*

*Atl. Richfield Co. v. USA Petroleum Co.,*
 495 U.S. 328 (1990) ............................................................................... 53

*Authenticom, Inc. v. CDK Global, LLC,*
 874 F.3d 1019 (7th Cir. 2017) ......................................... 1, 21, 22, 25

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007) ............................................................................... 19

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
 509 U.S. 209 (1993) ............................................................................... 53

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
 429 U.S. 477 (1977) ............................................................................... 50

*Car Carriers, Inc. v. Ford Motor Co.,*
 745 F.2d 1101 (7th Cir. 1984) .............................................................. 19

*Carmody v. Bd. of Trustees of Univ. of Ill.,*
 893 F.3d 397 (7th Cir. 2018) ................................................................ 31

*Cassell v. Michaux,*
 240 F.2d 406 (D.C. Cir. 1956) .............................................................. 32

*Chi. Prof'l Sports Ltd. P'shp v. NBA,*
 95 F.3d 593 (7th Cir. 1996) .................................................................. 21

iv

*Christy Sports, LLC v. Deer Valley Resort Co.,*
    555 F.3d 1188 (10th Cir. 2009) ........................................ 31

*Collins v. Associated Pathologists, Ltd.,*
    844 F.2d 473 (7th Cir. 1988) ...................................... 20, 39

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ........................................................ 54

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000) ....................................... 56

*Crest Hill Land Dev., LLC v. City of Joliet,*
    396 F.3d 801 (7th Cir. 2005) ......................................... 33

*Dalton v. Teva N. Am.,*
    891 F.3d 687 (7th Cir. 2018) ......................................... 50

*Datagate, Inc. v. Hewlett-Packard Co.,*
    60 F.3d 1421 (9th Cir. 1995) ..................................... 47-48

*Deppe v. NCAA,*
    893 F.3d 498 (7th Cir. 2018) ......................................... 19

*e360 Insight v. Spamhaus Project,*
    500 F.3d 594 (7th Cir. 2007) ......................................... 49

*Goldwasser v. Ameritech Corp.,*
    222 F.3d 390 (7th Cir. 2000) ......................... 21, 22, 26, 27

*Haynes v. Ind. Univ.,*
    902 F.3d 724 (7th Cir. 2018) ......................................... 28

*Hecker v. Deere & Co.,*
    556 F.3d 575 (7th Cir. 2009) ......................................... 33

*Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.,*
    935 F.2d 1469 (7th Cir. 1991) ....................................... 24

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.,*
    864 F.2d 1409 (7th Cir. 1989) ................................... 20, 46

*It's My Party, Inc. v. Live Nation, Inc.,*
    811 F.3d 676 (4th Cir. 2016) ....................... 20, 27, 37, 47

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.,*
    737 F.2d 698 (7th Cir. 1984) ....................... 15, 26, 27

v

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................ *passim*

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016) .......................................... 38, 39

*Kennedy v. Venrock Assocs.*,
    348 F.3d 584 (7th Cir. 2003) ................................................ 31

*King v. Kramer*,
    763 F.3d 635 (7th Cir. 2014) ......................................... 18, 19

*Kochert v. Greater Lafayette Health Servs., Inc.*,
    463 F.3d 710 (7th Cir. 2006) ................................................ 50

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................ 20

*MCI Commc'ns Corp. v. AT&T Co.*,
    708 F.2d 1081 (7th Cir. 1983) ....................................... 51, 54

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
    354 F.3d 661 (7th Cir. 2004) ................................................ 29

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) ........................................ 20, 46

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*,
    877 F.2d 1333 (7th Cir. 1989) .............................................. 56

*Midwest Gas Servs., Inc. v. Ind. Gas Co.*,
    317 F.3d 703 (7th Cir. 2003) ................................................ 53

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
    364 F.3d 1288 (11th Cir. 2004) ........................................... 28

*Muhammad v. Oliver*,
    547 F.3d 874 (7th Cir. 2008) ................................................ 33

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ..................................... *passim*

*O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*,
    36 F.3d 565 (7th Cir. 1994) ................................................. 46

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) ................................... 2, 22, 25

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
    629 F.3d 697 (7th Cir. 2011) ........................................ 20

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
    555 U.S. 438 (2009) ........................................ 21

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007) ........................................ 14, 26

*In re Publ'n Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012) ........................................ 51

*Redd v. Nolan*,
    663 F.3d 287 (7th Cir. 2011) ........................................ 19, 33

*Reifert v. S. Cent. Wis. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) ........................................ 47

*Roger v. Yellow Freight Sys., Inc.*,
    21 F.3d 146 (7th Cir. 1994) ........................................ 45

*Sanchez v. City of Chi.*,
    880 F.3d 349 (7th Cir. 2018) ........................................ 32

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006) ........................................ 21, 49

*Serv. & Training, Inc. v. Data Gen. Corp.*,
    963 F.2d 680 (4th Cir. 1992) ........................................ 40, 42

*SMS Sys. Maint. Servs., Inc. v. Dig. Equip. Corp.*,
    188 F.3d 11 (1st Cir. 1999) ........................................ 55

*Thomason v. Nachtrieb*,
    888 F.2d 1202 (7th Cir. 1989) ........................................ 19

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
    964 F.2d 186 (2d Cir. 1992) ........................................ 34, 47

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919) ........................................ 1

*United States v. Terminal R.R. Ass'n of St. Louis*,
    224 U.S. 383 (1912) ........................................ 25

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ........................................ *passim*

*Will v. Comprehensive Accounting Corp.*,
  776 F.2d 665 (7th Cir. 1985) ................................................. 3, 16, 44

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ................................................. 56

STATUTES & RULES

15 U.S.C. § 2 ................................................................. 12

Fed. R. Civ. P. 12(b)(6) ......................................................... 19

Fed. R. Civ. P. 54(b) .......................................................... 31

OTHER AUTHORITIES

ABA Section of Antitrust Law, *Proving Antitrust Damages:
  Legal and Economic Issues* (3d ed. 2017) ................................. 51, 54

3B Areeda & Hovenkamp, *Antitrust Law* (4th ed. 2015)

    ¶ 772c2 ................................................................ 23, 24, 28

    ¶ 772d2 ............................................................... 24

    ¶ 772d3 ............................................................... 35

10 Areeda & Hovenkamp, *Antitrust Law* (4th ed. 2018)

    ¶ 1748a ............................................................... 43

    ¶ 1748b ............................................................... 36

    ¶ 1753e ............................................................... 47

    ¶ 1753f ............................................................... 47

    ¶ 1756b2 .............................................................. 37

Cudahy & Devlin, *Anticompetitive Effect*,
  95 Minn. L. Rev. 59 (2010) ...................................................... 23

Easterbrook, *The Chicago School & Exclusionary Conduct*,
  31 Harv. J.L. & Pub. Pol'y 439 (2008) ........................................ 23

## JURISDICTIONAL STATEMENT

Appellant's jurisdictional statement is complete and correct.

## PRELIMINARY STATEMENT

The antitrust laws are properly hostile to claims premised on a unilateral refusal to deal. It has been settled for a century (and reaffirmed repeatedly since) that a firm, including a monopolist, is almost always free to choose with whom it will deal. *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). As this Court recently observed, "[e]ven monopolists are *almost never* required to assist their competitors." *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1025 (7th Cir. 2017) (emphasis added). Courts disfavor unilateral refusal to deal claims for multiple reasons, including that (1) "forced sharing" with rivals discourages investment and encourages inefficient free riding; (2) courts are "ill suited" to act as "central planners" administering such forced dealing; and (3) antitrust laws are skeptical of and generally discourage cooperation among competitors. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

In the face of this unfavorable legal precedent, Viamedia brought suit against Comcast for a unilateral refusal to deal with it. Viamedia and Comcast compete to obtain advertising inventory from pay television providers and to resell it to local and regional advertisers. In 2003, Comcast agreed to resell certain Viamedia advertising inventory to regional advertisers through "interconnects" owned and operated by Comcast in Chicago and Detroit. Elsewhere, Comcast has consistently and uniformly refused to deal with Viamedia. In 2012, Comcast stopped reselling Viamedia's inventory with the goal, demonstrated by Viamedia's own allegations, of

disintermediating Viamedia and establishing direct relationships with Viamedia's pay television customers.

Judge St. Eve correctly dismissed Viamedia's refusal to deal theory because Viamedia's own allegations established that Comcast's alleged refusal to deal was not "irrational but for its anticompetitive purpose." SA107 (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.)). Instead, the district court reasoned that "replacing intermediaries is a prototypical valid business purpose," and that direct dealing "offers potentially improved efficiency." SA108 (quotation omitted). The United States, in its amicus brief, endorses the district court's legal standard as "consistent with Supreme Court and Seventh Circuit precedent and with longstanding Department of Justice policy." U.S. Br. 7.

Viamedia advances no valid basis to reverse Judge St. Eve's dismissals of its claims. Viamedia attempts to shoehorn its refusal to deal theory into the "limited exception" of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), which this Court has described as a "narrowly written" decision with "unusual facts." *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986). The Supreme Court subsequently described it as "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409.

As demonstrated below, the facts alleged by Viamedia prevented Viamedia from aligning its theory with *Aspen Skiing*. Unlike in *Aspen Skiing*, where the parties' "cooperative venture" was coextensive with their competition, cooperation between Viamedia and Comcast constituted a limited departure from their

2

overwhelmingly competitive relationship. And unlike the plaintiff in *Aspen Skiing*, Viamedia admitted in its complaint that Comcast's motivation was to remove Viamedia as an intermediary, and serve pay television providers directly—a classic example of procompetitive vertical integration. In contrast, the defendant in *Aspen Skiing* failed to offer "any efficiency justification whatever." 472 U.S. at 608.

Viamedia also advances several new legal and factual arguments for the first time on appeal. Because Viamedia did not present those arguments to the district court, they are waived. In any event, Viamedia's unpreserved arguments are wrong.

Faced with incurable defects in its refusal to deal theory, Viamedia attempted to recharacterize Comcast's conduct as unlawful tying. Judge St. Eve allowed discovery on Viamedia's tying theory, but on summary judgment properly ruled that the theory failed as a matter of law, and that Viamedia's alleged harm was not caused by any anticompetitive conduct.

On appeal, Viamedia challenges the district court's conclusion that Viamedia could not establish that Comcast conditioned interconnect access (the "tying" product) on purchases of ad representation services (the "tied" product). Coerced sales of a tied product are an essential element of a tying claim. *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 669 (7th Cir. 1985). Here, the uncontroverted evidence showed that (1) Comcast never denied an MVPD's request for an interconnect-only deal; (2) 14% of Comcast's recent agreements were interconnect-only deals; (3) each of the alleged victims of Comcast's tying demanded

3

the products together in a bundle; and, (4) withholding the tying product from Viamedia entailed no foreclosure.  Accordingly, there was no tying as a matter of law.

Viamedia's true grievance is that Comcast declined to provide interconnect services *to Viamedia* so that Viamedia could bundle them with its own ad representation services.  As the district court concluded, "Viamedia's theory extends tying beyond the law's recognition," and "Viamedia has no antitrust right to help it sell such a bundle." SA32, 39.

The district court also correctly determined that Viamedia had no evidence of antitrust injury.  To the contrary, Viamedia's CEO and experts conceded that its alleged harms flowed from its lack of interconnect access, i.e., Comcast's lawful refusal to deal.  The record was devoid of "evidence showing that Comcast has raised, plans to raise, or even has the ability to raise prices," or that "Comcast has reduced or plans to reduce output." SA44.  Indeed, the uncontroverted evidence showed that Comcast lowered prices.

Finally, the district court properly excluded much of Viamedia's proffered expert testimony under *Daubert*.  Viamedia's liability expert employed a legally flawed definition of tying, and proffered an improper lay interpretation of evidence. Viamedia's damages expert relied on defective assumptions, including that Viamedia's claimed losses from its inability to access Comcast's interconnects—i.e., Comcast's lawful refusal to deal—constituted "tying" damages.

4

In sum, the district court's rulings are consistent with settled precedent, Viamedia's judicial admissions, and the uncontroverted evidence. Its dismissal of Viamedia's claims should be affirmed.

## STATEMENT OF THE ISSUES

1.     Whether the district court properly dismissed Viamedia's refusal to deal theory when Viamedia's allegations showed that Comcast's "refusal" was motivated by the prototypical valid business purpose of disintermediation.

2.     Whether the district court properly granted summary judgment rejecting Viamedia's tying theory when uncontroverted evidence showed (i) Comcast was willing to sell the "tying" product to retail customers on a standalone basis; (ii) the alleged "victims" demanded the "tying" and "tied" products *only* as a bundle; (iii) Viamedia, a competitor in the "tied" product market, sought to bundle Comcast's "tying" product for sale to retail customers; (iv) Viamedia's contracts with retail customers barred them from purchasing the "tying" product directly from Comcast; and (v) withholding the "tying" product from Viamedia did not entail any anticompetitive foreclosure.

3.     Whether the district court properly held that Viamedia could not establish antitrust injury or damages when Viamedia's witnesses admitted that its alleged harm flowed entirely from Comcast's lawful refusal to deal.

4.     Whether the district court appropriately exercised its discretion to exclude the testimony of proffered experts whose opinions rested on errors of law.

## STATEMENT OF THE CASE

This section first reviews the allegations in the amended complaint and then summarizes the uncontroverted evidence from discovery.  Only the former are relevant to the district court's motion to dismiss rulings, while the latter inform the summary judgment decision.

## A.     Allegations of the Amended Complaint

### 1.     Spot Cable Advertising

Pay television services are provided by multichannel video programming distributors ("MVPDs").  MVPDs distribute cable networks like ESPN, which allot some advertising inventory—called "availabilities" or "avails"—for sale by MVPDs. A54-56 (¶¶ 23, 27, 30).  These "spot cable advertising" availabilities are sold principally to (1) local advertisers that target a portion of a metropolitan area ("DMA"), and (2) regional advertisers that seek DMA-wide coverage.  A55-57, 62 (¶¶ 27, 31, 34, 59-60).

Many MVPDs contract with "ad representatives" to sell their availabilities. A64-65 (¶ 72).  Ad representatives market, organize, and sell MVPDs' ad inventory to advertisers, and handle billing, collection, and other services.  A64-65 (¶¶ 70, 74-75).  Comcast's Spotlight division provides ad representation services to Comcast and other MVPDs.  A67 (¶ 85).  Viamedia is a competing ad representative.  A50-53, 66 (¶¶ 9, 17, 79).

### 2.     Interconnects

Interconnects are a "technical and business infrastructure" that aggregate and sell avails from participating MVPDs to advertisers, whose advertisements run

simultaneously on these MVPDs.  A49, 57 (¶¶ 4, 35-37).  They thereby provide regional advertisers with a "one-stop shop" to target consumers throughout a DMA. A57 (¶ 37).  The largest MVPD in each DMA typically operates the interconnect and charges fees to participating MVPDs.  A59 (¶ 44).  Comcast operates interconnects in DMAs including Chicago and Detroit.  A67-68 (¶¶ 86-94).

As an interconnect operator, Comcast generally did not deal with Viamedia. A51, 73 (¶¶ 11, 121).  Although Comcast and Viamedia overlap in "many" DMAs, Viamedia participated in Comcast's interconnects *only* in Chicago and Detroit. A51, 66 (¶¶ 11, 78).  This matches the industry pattern, in which interconnect operators generally do not deal with Viamedia.  When it filed its complaint, Viamedia participated in interconnects in *only five* of the "more than 70 DMAs" in which it operated.  *See* A65-66, 83-84 (¶¶ 76, 164).

### 3.   The Alleged Refusal to Deal

In 2012, Viamedia's clients included cable companies WOW! and RCN.  A70 (¶ 103).  Pursuant to "longstanding contractual relationships," Viamedia represented those MVPDs in selling spot cable advertising in Chicago and Detroit, and therefore controlled their avails.  A70-71 (¶¶ 103, 106).

Comcast "unilaterally" decided that as of June 1, 2012, it would no longer sell availabilities controlled by Viamedia through its Chicago and Detroit interconnects. A71-72 (¶ 110).[1]  Comcast was "willing to consider Viamedia's readmission" to the

---

[1] As explained below, Comcast sold these avails pursuant to an agreement with Viamedia that expired on May 31, 2012.  Viamedia's opening brief ("Br.") 11-12.

Chicago and Detroit interconnects, but Viamedia deemed Comcast's offer
"commercially unreasonable." A73-74 (¶ 122).

Viamedia alleged that its "exclusion was motivated by Comcast Spotlight's
desire to replace Viamedia as WOW's and RCN's Spot Cable Advertising
Representative." A72 (¶ 112). Comcast sought direct deals with WOW! and RCN,
without Viamedia as an intermediary. A74 (¶¶ 124-125). Comcast subsequently
achieved that objective, becoming their ad representative in Chicago and Detroit,
and selling their availabilities on its interconnects. A74-76 (¶¶ 126-127, 130-131).

Comcast also operates an interconnect in Hartford, Connecticut. A69 (¶ 97).
Prior to 2014, an MVPD in Hartford dealt directly with Comcast, including for sale
of avails on Comcast's interconnect. A76-77 (¶ 136). In 2014, Frontier acquired this
MVPD and hired Viamedia rather than Comcast as its ad representative. *Id.*
Comcast declined to deal with Viamedia as an intermediary reselling Frontier's
avails. A77 (¶ 137). Comcast also declined to deal with Viamedia in other DMAs
where, as in Hartford, Comcast had no prior dealings with Viamedia. A83 (¶ 162).

Viamedia alleged that Comcast "forfeited" fees and reduced the "economic
value" of the Chicago, Detroit, and Hartford interconnects by not dealing with
Viamedia. A82-83 (¶¶ 160-161). Viamedia advanced no allegations regarding "later
monopoly recoupment" of "sacrificed profits." Br. 5.

## B.  <u>Undisputed Facts</u>

The following facts were uncontroverted before the district court when it
entered summary judgment dismissing Viamedia's tying theory.

### 1.     <u>Spot Cable Advertising Representation</u>

Ad representation is governed by "rep agreements," which grant ownership of an MVPD's availabilities to the ad representative.  DA642 (¶ 11).  The "industry standard" is "full-turnkey" representation, in which the MVPD sells all of its commercial avails to a single ad representative and grants the representative "the exclusive right to manage and sell that MVPD's avails in the relevant DMAs." DA651-52 (¶¶ 25-26); A548 (¶ 2).

Less commonly, an MVPD enters into an "interconnect-only" deal, selling some commercial avails to the interconnect operator to resell on a DMA-wide basis, and retaining others to sell on a local basis.  DA653-54 (¶¶ 29, 30).  MVPDs with interconnect-only agreements either employ in-house salespeople for local sales or hire a separate ad representative for local sales.  DA655-56 (¶¶ 31-32).

Interconnect operators achieve economies of scale in providing local representation, because local sales utilize much of the same technical and business infrastructure as interconnect sales (e.g., the same traffic and billing systems and the same marketing and research).  DA649-50 (¶ 23).

### 2.     <u>The 2003 Agreement between Comcast and Viamedia</u>

In 2003, Viamedia had exclusive, full-turnkey ad representation agreements with WOW! and RCN for Chicago and Detroit.  DA660, 662 (¶¶ 42, 44).  A 2003 agreement between Viamedia and Comcast granted Comcast the exclusive right to sell through its Chicago and Detroit interconnects some of the availabilities that Viamedia purchased from WOW! and RCN.  DA660-62 (¶¶ 42-43); A430-43.

Viamedia expressly agreed that, upon the agreement's expiration, "Comcast shall have the right" to solicit RCN's and WOW!'s business in Chicago and Detroit. A439 (§ 9.10). The agreement expired by its own terms on May 31, 2012. DA663 (¶ 46); A433 (§ 3.1).

### 3.   Competition to Represent MVPDs

Viamedia and Comcast compete for the business of MVPDs, including WOW! and RCN. According to its former CFO, Viamedia was at a ███████████

████████████████████████████████████████████████████ DA464

(93:18-19). ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

DA496.

***WOW!***. In October 2013, WOW! solicited from Viamedia and Comcast bids for exclusive full-turnkey representation after its agreement with Viamedia expired in 2014. DA683 (¶ 88). Viamedia won the competition and extended its agreement with WOW! through 2015. DA683-84 (¶ 89). In 2015, WOW! again requested proposals from Comcast and Viamedia for exclusive, full-turnkey representation. DA684 (¶ 90). Comcast won the competition for Chicago and Detroit by offering superior financial terms. DA684-85 (¶¶ 91-92).

*RCN*.  In 2015, RCN sought bids from Comcast and Viamedia for exclusive, full-turnkey representation in DMAs including Chicago after its agreement with Viamedia expired in 2015.  DA687-88 (¶¶ 96, 99).  RCN selected Comcast because it offered more favorable financial terms. DA688-89 (¶¶ 100-101).

### 4.   Comcast's Alleged Tying

Comcast prefers to deal directly with MVPDs, rather than with intermediaries such as Viamedia, and has found substantial benefits from direct dealings.  DA663-64 (¶ 48).

When the parties' agreement expired in 2012, Comcast declined to renew it. DA663 (¶¶ 46-47).  Viamedia insists that by denying it access to interconnects, Comcast "depart[ed] from industry practice."  Br. 12.  But Viamedia ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████     DA285 (¶ 23).

Viamedia's agreements with WOW! and RCN prevented the MVPDs from dealing directly with Comcast.  DA664-66 (¶¶ 49, 51).  Viamedia characterizes Comcast's decision not to renew the parties' 2003 agreement and the MVPDs' inability to deal directly with Comcast as "tying" by Comcast.  *E.g.*, A216-17 (¶¶ 65, 67)████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

After their agreements with Viamedia expired, WOW! and RCN each sought *only* an exclusive, full-turnkey deal with a single ad representative.  DA684, 686-88, 690-91 (¶¶ 90, 95, 99, 104).  WOW! and RCN *never* sought the "tying" product on a standalone basis—i.e., an interconnect-only deal.  DA653-54 (¶ 29); DA684, 688 (¶¶ 90, 100); A210, 215 (¶¶ 53, 63); Br. 44.

There is no evidence that Comcast ever declined an MVPD's request for the "tying" product on a standalone basis.  DA702 (¶ 123).  Fourteen percent of Comcast's agreements with MVPDs since December 2011 were interconnect-only agreements.  DA703 (¶ 124).  None of Comcast's interconnect-only agreements prohibit an MVPD from hiring another ad representative for local sales.  DA703-04 (¶ 126).

## C.  <u>Viamedia's Claims and Proffered Expert Opinions</u>

Viamedia asserted claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, for unlawful unilateral refusal to deal and tying.  The refusal to deal theory challenged Comcast's decisions to end Viamedia's access to Comcast's Chicago and Detroit interconnects and not to admit Viamedia to Comcast's Hartford interconnect.  Viamedia relied principally on *Aspen Skiing*, arguing that "here, as in *Aspen Skiing*, Comcast had 'no valid business reasons for the refusal' to deal with its competitor."  DA15 (quoting *Aspen Skiing*, 472 U.S. at 605).[2]

---

[2] Viamedia never urged that its state antitrust claims be treated differently from its federal claims.  SA17 n.6; SA109 n.10.  Viamedia has abandoned an exclusive dealing theory and a tort claim.  Br. 18 n.5; DA602 n.2.

Under the tying theory, Comcast allegedly conditioned the sale of "Interconnect Services" (the alleged tying product) to MVPDs (WOW!, RCN, and Frontier) on the purchase of "Ad Rep Services" (the alleged tied product) from Comcast.

Viamedia offered two witnesses as experts. Thomas Lys, Viamedia's proffered damages expert, sponsored a "hypothetical 'but-for world'" that purportedly "place[d] Viamedia in the same position that it would have been in but for [the alleged] anticompetitive conduct." A594 (¶ 25). His "but-for" world assumed that Viamedia would have had access to Comcast's Chicago, Detroit, and Hartford interconnects after May 31, 2012 on the terms of the parties' 2003 agreement. A649-50, 654, 661 (¶¶ 199, 218, 240). Lys conceded that all of the claimed damages resulted from Viamedia's lack of access to Comcast's interconnects. DA157 (99:17-100:19).

Harold Furchtgott-Roth, Viamedia's proffered liability expert equated Comcast's "refusal" to deal with Viamedia to tying, and opined that it was "an integral part of Comcast's tying conduct." A218 (¶ 70); *see*, *e.g.*, A216-17 (¶¶ 65, 67).

Viamedia conceded that it did not proffer any expert testimony regarding causation. DA575 (149:2-5).

**D.     The District Court's Challenged Rulings**

**1.     Dismissal of Viamedia's
            Refusal to Deal Theory on the Pleadings**

On Comcast's motion to dismiss Viamedia's original complaint, the district court dismissed Viamedia's refusal to deal theory without prejudice. The court held

that theory lacked merit because Viamedia's allegations failed to show that Comcast's purported refusal was "irrational but for its anticompetitive effects." SA107.

The court concluded that Viamedia's own allegations pleaded a valid business purpose for Comcast's alleged refusal to deal: removing an intermediary, by replacing Viamedia. SA107-08. "Before Comcast's refusal to deal, MVPDs gave Viamedia control of their Spot Cable Avails and then Viamedia gave control over a portion of those Avails to the Interconnect." SA108. Subsequently, "for the portion of Avails sold through an Interconnect, MVPDs simply deal with Comcast directly." *Id.*

The court reasoned that targeting direct deals "offers potentially improved efficiency" and that "replacing intermediaries is a 'prototypical valid business purpose.'" SA108 (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007)). Accordingly, the court concluded that Viamedia's refusal to deal theory lacked merit. *Id.*

In an amended complaint, Viamedia added allegations purporting to show that Comcast's refusal to deal was "irrational but for its anticompetitive effects." A80-85 (¶¶ 154-168) (capitalization altered). The court dismissed Viamedia's refusal to deal theory with prejudice. SA58. It reasoned that Viamedia's allegations of "short-term losses" to Comcast were not "necessarily indicative of anticompetitive conduct," explaining that a "monopolist might wish to withdraw

14

from a prior course of dealing and suffer a short-term profit loss in order to pursue perfectly competitive ends." SA66 (quotation omitted).

The court also rejected Viamedia's argument that Comcast merely replaced one intermediary (Viamedia) with another (Comcast Spotlight), reasoning that argument was "belie[d]" by Viamedia's allegations, which "sensibl[y]" treated Comcast and Comcast Spotlight as "a single economic entity." SA68.

The court explained that vertical integration—which "is usually procompetitive," SA67-68 (quoting *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710 (7th Cir. 1984))—means that the vertically integrated firm fills the former middleman's role. SA69. The court held that "based on Viamedia's allegations, Comcast has engaged in a business practice that has a rational procompetitive purpose: It has become 'a one-stop shop' in certain DMAs for MVPDs wishing to sell advertisements on a regional basis." *Id.*

### 2. Summary Judgment Dismissing <u>Viamedia's Remaining Antitrust Theories</u>

Following full discovery on Viamedia's remaining claims, the district court granted summary judgment to Comcast on two principal grounds.

*First*, there was no evidence that Comcast conditioned its sale of Interconnect Services to MVPDs on their purchase of Ad Rep Services from Comcast.[3]  The undisputed fact that "14 percent of Comcast's agreements with MVPDs are interconnect-only"—i.e., standalone sales of the "tying" product—"belie[d] any

---

[3] As to the contested issue whether these are separate products, the court merely "assume[d]" that they are distinct. SA29 n.10.

inference that Comcast tied its services." SA30.  Moreover, in Chicago and Detroit, "both RCN and WOW! *wanted* full-turnkey representation." SA31.  The court held that "'the voluntary purchase of two products together' is 'not a tie at all.'" SA32 (quoting *Will*, 776 F.2d at 669).

"The real rub of Viamedia's tying claim," according to the court, was that "Comcast withheld the tying product *from its rival Viamedia*." SA32.  Viamedia's theory "extends tying beyond the law's recognition" because there was no "actual tie." *Id.* (quotation omitted).  Viamedia aimed to sell MVPDs a bundle of Comcast's interconnect services with Viamedia's ad representation services, but "Viamedia has no antitrust right to force Comcast to help it sell such a bundle to their mutual customers." SA39.

*Second*, there was no triable issue as to antitrust injury or damages. Viamedia's alleged injuries were "fully attributable to Comcast's decision to deny Viamedia interconnect access," and thus came down to "Comcast's undisputed and legal refusal to deal." SA50-51.  Similarly, Viamedia's evidence "fail[ed] to disaggregate the damages caused by Comcast's lawful refusal to deal from Comcast's supposed tying." SA54.

The court rejected Viamedia's "free-standing" exclusionary conduct theory as "procedurally barred" and, because the conduct was "merely a refusal to deal," meritless. SA47-48.

Finally, the court ruled that Viamedia's request for injunctive relief betrayed the "fundamental flaw" in Viamedia's entire case:  Viamedia sought "enforced

sharing absent a duty to deal." SA56. "Viamedia brought this case in an attempt to force—under Court order—Comcast to provide it access to the interconnects on favorable terms. Antitrust law does not oblige." SA57.

### 3. Exclusion of Viamedia's Expert Testimony under *Daubert*

The district court excluded Lys's damages opinions because he assumed that Viamedia could have accessed the interconnects but for Comcast's anticompetitive conduct. His opinions did not fit the facts of the case, so they were inadmissible. SA55.

The court excluded Furchtgott-Roth's opinion that Comcast had engaged in tying for two reasons. SA40. *First*, the opinion "rest[ed] exclusively on a lay interpretation of evidence." SA41. *Second*, it was contrary to law because Furchtgott-Roth sought "to hold Comcast liable for the mere withholding of the tying product, not the forced sale of a tied product, and not even to a customer, but to a competitor." SA42-43.

## SUMMARY OF THE ARGUMENT

The district court properly dismissed Viamedia's refusal to deal theory. Viamedia's allegations showed that Comcast had a valid business reason not to deal with Viamedia: removing Viamedia as an intermediary to deal directly with MVPDs. The court correctly held that disintermediation is a procompetitive business purpose that precludes any finding that Comcast's alleged refusal to deal was "irrational but for its anticompetitive effect." SA107. The valid business

purpose pleaded by Viamedia ends the inquiry; as the United States notes in its amicus brief, there is no balancing of benefits against harms.  U.S. Br. 15.

On appeal, Viamedia fails to cite a single post-*Trinko* case that imposed a duty to deal.  Instead, Viamedia attempts to fit its claims into the "limited exception" of *Aspen Skiing*.  That effort fails because Viamedia itself pleaded a valid business purpose for Comcast's conduct.  In addition, Viamedia advances several new legal and factual arguments that were never presented to the district court and are accordingly waived.  *King v. Kramer*, 763 F.3d 635, 641 (7th Cir. 2014).  In any event, those arguments lack merit.

The district court properly granted summary judgment dismissing Viamedia's tying theory.  Viamedia challenges only the determination that there is no triable issue as to the essential element of "conditioning" or "forcing."  This determination rests securely on multiple independent legal grounds, including the uncontroverted evidence that Comcast readily sold the alleged tying product on a standalone, untied basis and the alleged victims of tying always sought to purchase the tying and tied products as a bundle.  There is no evidence that Comcast conditioned interconnect access on an MVPD's purchase of ad representation services for local sales.

Viamedia's "free-standing" Section 2 claim is procedurally barred, and is meritless, for the same reason as its tying claim:  Viamedia's real grievance is that Comcast lawfully refused to deal with it.

18

Further, Viamedia failed to isolate injury caused by allegedly unlawful conduct (tying) from injury caused by lawful conduct (refusal to deal). Instead, its CEO and experts conceded that the alleged harm flowed from Viamedia's lack of access to Comcast's interconnects. For this reason, among others, Viamedia cannot show antitrust injury or damages. Viamedia's proffered experts' opinions suffered from the same defects that pervade its legal arguments, and the court therefore did not abuse its discretion in excluding those opinions.

## STANDARD OF REVIEW

This Court reviews *de novo* the dismissal of the refusal to deal theory. *Deppe v. NCAA*, 893 F.3d 498, 500 (7th Cir. 2018). Under Rule 12(b)(6), dismissal is appropriate where the well-pleaded allegations, disregarding legal conclusions, fail to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Appellate review is limited to the "allegations of the complaint." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984). "[T]he complaint may not . . . be amended by the briefs on appeal." *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989). Arguments that were not presented to the district court are waived. *King*, 763 F.3d at 641. In reviewing a motion to dismiss, a court should disregard evidence that "became available when the case progressed to summary judgment" but was not alleged in the complaint. *Redd v. Nolan*, 663 F.3d 287, 290 (7th Cir. 2011). As set forth below, Viamedia's effort to introduce new legal and factual arguments on appeal is improper.

19

This Court also reviews *de novo* the district court's decision to grant summary judgment on Viamedia's remaining theories. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). To withstand summary judgment, a plaintiff must "affirmatively demonstrate, by producing evidence that is more than 'merely colorable,' that there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

In antitrust cases, a plaintiff opposing summary judgment must "present evidence that tends to exclude the possibility that the [defendant's] conduct was as consistent with competition as with illegal conduct." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 856 (7th Cir. 2011) (citation omitted); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 13 (7th Cir. 1989).

The Supreme Court has warned that lengthy and costly antitrust litigation carries the risk of "chill[ing] the very conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594. Cases brought by competitors such as Viamedia accentuate the risk, and pose a "special hazard." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 691 (4th Cir. 2016). Summary judgment in antitrust cases is thus "encouraged." *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 475 (7th Cir. 1988).

20

# ARGUMENT

## I.    The District Court Properly Dismissed
Viamedia's Refusal to Deal Theory on the Pleadings

### A.    Antitrust Liability for a Unilateral
Refusal to Deal Is Strongly Disfavored

Firms generally have no antitrust duty to deal with rivals.  *Trinko*, 540 U.S. at 408.  "[E]ven a monopolist is entitled to compete," and "[p]art of competing like everyone else is the ability to make decisions about with whom and on what terms one will deal."  *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000); s*ee Authenticom,* 874 F.3d at 1025 ("Even monopolists are almost never required to assist their competitors.").

Forcing a firm to share the fruits of its investments with a competitor tends to harm overall welfare by discouraging businesses from innovating.  *Trinko*, 540 U.S. at 407-08.  Coerced dealing with rivals also requires courts to act as "central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited."  *Id.* at 408; *see also Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 452-53 (2009) ("No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise.") (quotation omitted); *Chi. Prof'l Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("[T]he antitrust laws do not deputize district judges as one-man regulatory agencies.").  Moreover, "compelling negotiation between competitors may facilitate the supreme evil of antitrust:  collusion."  *Trinko*, 540 U.S. at 408; *see Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) ("Cooperation is a *problem* in antitrust, not one of its obligations.").  In its amicus brief, the United States

21

endorses these principles and warns of the serious competitive dangers of forced sharing.  U.S. Br. 10.

The "limited exception" to the absence of a duty to deal is *Aspen Skiing*, which is "at or near the outer boundary of § 2 liability."  *Trinko*, 540 U.S. at 409; *see Authenticom*, 874 F.3d at 1026 ("[A]n order to continue to do business with a firm is proper only if the case fits within the limited exception recognized in *Aspen Skiing*.") (quotation omitted).  *Aspen Skiing* involved "unusual facts" and was "narrowly written."  *Olympia Equip.*, 797 F.2d at 379.  The defendant "Ski Co." owned three of four ski mountains in Aspen, Colorado, and the plaintiff owned the fourth.  For years, both parties sold a joint pass to skiers.  *Aspen Skiing*, 472 U.S. at 588-91.  When Ski Co. terminated the joint pass, the plaintiff sought to buy Ski Co.'s lift tickets to recreate the joint pass, but Ski Co. refused to sell to the plaintiff.  *Id*. at 592-94.  Ski Co. "fail[ed] to offer any efficiency justification whatever for its pattern of conduct."  *Id*. at 608.

As the Supreme Court explained in *Trinko*, *Aspen Skiing* upheld liability because the "unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end," and Ski Co.'s "unwillingness to renew the ticket even if compensated at retail price revealed a distinctly anticompetitive bent."  *Trinko*, 540 U.S. at 409 (emphasis omitted); *see also Goldwasser*, 222 F.3d at 398 (explaining that Ski Co.'s decision "to forgo cash revenues and efficient methods of doing business for the sole purpose of driving its rival out of the market" was decisive).

22

*Aspen Skiing* was "the high-water mark in section 2 cases for a duty-to-deal theory." *Authenticom*, 874 F.3d at 1026.  After *Trinko*, antitrust claims based on a duty to deal with rivals "bit the dust."  Easterbrook, *The Chicago School & Exclusionary Conduct*, 31 Harv. J.L. & Pub. Pol'y 439, 442 (2008); *see also* Cudahy & Devlin, *Anticompetitive Effect*, 95 Minn. L. Rev. 59, 76 (2010) ("A dominant firm's obligation to deal with its rivals has been narrowed to the point that some question its ongoing relevance.").

### B.    The District Court Properly Applied the "Irrational But For Its Anticompetitive Effect" Standard

The district court correctly held that there is no liability under *Aspen Skiing* where, as here, the defendant's alleged termination of a pre-existing course of dealing was not "irrational but for its anticompetitive effect."  SA64-66.  Indeed, Viamedia endorsed this legal standard below.  DA34, 37, 44.

Then-Judge Gorsuch applied this test in the leading post-*Trinko* decision on unilateral refusals to deal.  *Novell*, 731 F.3d 1064.  "To avoid penalizing normal competitive conduct," the law requires "proof not just that the monopolist decided to forsake short-term profits," but also "that the monopolist's refusal to deal was part of a larger anticompetitive enterprise." *Id.* at 1075; *see also Aspen Skiing*, 472 U.S. at 604-05 ("[R]efusal to deal . . . does not violate Section 2 if valid business reasons exist for that refusal.") (quotation omitted); Areeda & Hovenkamp, *Antitrust Law* ¶ 772c2, at 222 (4th ed. 2015) ("Areeda") ("*Aspen [Skiing]* leaves monopolists free to refuse to deal or cooperate with rivals for legitimate business reasons.").

23

In its amicus brief, the United States explains that the "irrational but for its anticompetitive effects" test harmonizes "with longstanding Department of Justice policy" of applying a "no economic sense" test to refusal to deal liability. U.S. Br. 7. Further, "[a]n overly expansive § 2 duty to deal comes dangerously close to being a form of 'no-fault' monopolization if refusal to share productive assets with rivals is the monopolist's only offense." *Id.* at 13-14 (quoting Areeda ¶ 772d2, at 229).

Viamedia appears to acknowledge that a refusal to deal is lawful if it is "justified by legitimate competitive reasons." Br. 4, 27. But Viamedia advances two novel legal standards that contradict governing law and would expand liability for unilateral refusals to deal beyond the "outer boundary" identified in *Trinko.* 540 U.S. at 409.

*First*, Viamedia baldly asserts that a monopolist can be liable for terminating sales to a rival of a product that the monopolist sells to others, "and thereby sacrific[ing] short-term profits to achieve a long-term monopoly." Br. 4. A short-term profit sacrifice is not sufficient, however; anticompetitive conduct is required. *See*, *e.g.*, *Novell*, 731 F.3d at 1075; Areeda ¶ 772c2, at 222.

Viamedia employs sleight of hand to eliminate the requirement of anticompetitive conduct: where *Trinko* refers to "forsak[ing] short-term profits to achieve an anticompetitive end," 540 U.S. at 409, Viamedia substitutes "sacrific[ing] short-term profits to achieve a long-term monopoly." Br. 4. But monopoly can be achieved through procompetitive or anticompetitive means. *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir. 1991). Thus, Viamedia's

24

substitution erroneously excises the essential element of anticompetitive conduct from the law.  Viamedia's standard also is useless to Viamedia because its amended complaint is devoid of any allegations showing "long-term" monopoly.

*Second*, Viamedia asserts (again without authority) that Section 2 is violated when a monopolist's refusal to deal "has seriously hampered competition and when the concerns militating against imposition of a duty to deal are absent or significantly attenuated."  Br. 26.  That nebulous standard is ungrounded in the law, under which *Aspen Skiing* provides the "limited exception" to the general rule of no duty to deal.  *Trinko*, 540 U.S. at 409; *Authenticom*, 874 F.3d at 1026.  And Viamedia's refusal to deal theory does not fit within *Aspen Skiing* because of the conspicuously pleaded business justification for Comcast's challenged conduct.

Viamedia does not cite *a single* post-*Trinko* case that imposed a duty to deal. Instead, Viamedia invokes pre-*Trinko* decisions, but those cases do not support Viamedia's position.  As *Trinko* explained, *United States v. Terminal Railroad Association of St. Louis*, 224 U.S. 383 (1912), "involved *concerted* action," which is distinguishable from the unilateral conduct at issue here.  540 U.S. at 410 n.3.

Viamedia's reliance on *Olympia Equipment* and *Goldwasser* is also misplaced because neither case imposed a duty to deal.  Br. 26-28.  To the contrary, in *Olympia Equipment*, this Court explained:  "If a monopolist does extend a helping hand, though not required to do so, and later withdraws it as happened in this case, does he incur antitrust liability?  We think not."  797 F.2d at 376.  That is precisely what happened here when Comcast declined to renew its agreement to resell

25

Viamedia's advertising inventory through its Chicago and Detroit interconnects. *See id.* at 379 ("Refusing to act as your competitor's sales agent is not an unnatural practice engaged in only by firms bent on monopolization."). Similarly, in *Goldwasser*—a case Viamedia never even cited to the district court—this Court held that "the antitrust laws do not impose [an] affirmative duty, even on monopolists" to "help its competitors." 222 F.3d at 400.

### C. The District Court Correctly Dismissed Viamedia's Refusal to Deal Theory Based on Allegations Showing Comcast's Valid Business Purpose

The district court properly held that Viamedia's own allegations demonstrated that Comcast was motivated by a valid business purpose. As Viamedia alleged, "Comcast acknowledged that the exclusion was motivated by Comcast Spotlight's desire to replace Viamedia as WOW!'s and RCN's Spot Cable Advertising Representative." A72 (¶ 112). Moreover, Viamedia alleged facts showing that Comcast achieved its objective by signing direct deals with WOW! and RCN. A74-76 (¶¶ 126-127, 130-131).

The court correctly reasoned that replacing an intermediary such as Viamedia with a direct customer relationship is a "prototypical valid business purpose." SA108 (quoting *Port Dock & Stone*, 507 F.3d at 124); *see* SA107 (quoting *Jack Walters*, 737 F.2d at 710 ("We just said that vertical integration is not an improper objective. But that puts the matter too tepidly; vertical integration usually is procompetitive.")). As the district court recognized, "elimination of a middleman" is a "type of vertical integration" that is procompetitive. SA67.

26

Vertical integration is also procompetitive because it creates "cost savings," which can make the integrated firm "a more effective competitor," and can also "place[] competitive pressure on the firm's . . . buyers, who know that if they charge too much for their services the firm may decide to perform them itself" thus "increas[ing] competition in the [related] markets." *Jack Walters*, 737 F.2d at 710; *see also It's My Party*, 811 F.3d at 689 ("A single firm incorporating separate but closely related production processes can often be far more efficient than various independent entities transacting to produce the same good or bundle of goods.").[4] And "[m]onopolists are just as entitled as other firms to choose efficient methods of doing business." *Goldwasser*, 222 F.3d at 398.

The valid business objective that appears on the face of Viamedia's complaint distinguishes this case from *Aspen Skiing*, where the defendant "fail[ed] to offer any efficiency justification whatever for its pattern of conduct." 472 U.S. at 608; *Goldwasser*, 222 F.3d at 398 (explaining that Ski Co. abandoned "efficient methods of doing business for the sole purpose of driving its rival out of the market").

The district court correctly recognized that the presence of a valid business purpose ends the inquiry (SA69)—there is no "balancing" of benefits and harms. As the United States explains, "[i]f a refusal to deal serves a legitimate business purpose, Section 2 makes no further inquiry into its effects on competition." U.S.

---

[4] Viamedia suggests that the vertical integration in *Jack Walters* was somehow different from Comcast's disintermediation of Viamedia. Br. 36. But in *Jack Walters* the defendant's vertical integration involved "deal[ing] directly with the consuming public rather than indirectly through [intermediaries] such as [the plaintiff]." 737 F.2d at 710.

Br. 15 (citing *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004) (a "refusal to deal that is designed to protect or further the legitimate business purposes of a defendant does not violate the antitrust laws, even if that refusal injures competition")).  Similarly, the Areeda treatise explains:

> *Aspen* [*Skiing*] leaves monopolists free to refuse to deal or cooperate with rivals for legitimate business reasons.  Observe, moreover, that the Court did not call for any balancing of the social gains from refusal to deal or cooperate with rivals based on legitimate business purposes against the losses resulting from the refusal.  Rather, the Court classified conduct or intention as either lawful or not on the basis of the presence or absence of legitimate business purposes.

Areeda ¶ 772c2, at 222.  Therefore, Viamedia's allegations showing that Comcast's challenged conduct has a valid business purpose end the inquiry.

In short, Viamedia *itself* pleaded that Comcast's decision not to deal with Viamedia was motivated by the goal of disintermediating Viamedia and, in fact, disintermediated Viamedia.  Viamedia cannot contradict these "binding judicial admission[s]" on appeal.  *Haynes v. Ind. Univ.*, 902 F.3d 724, 731 (7th Cir. 2018).

### D.  Viamedia Advances No Valid Basis To Reverse the District Court's Decision

#### 1.  Viamedia's Arguments Based on the Timing of Comcast's Actions Lack Merit

Viamedia advances several arguments related to the timing of Comcast's decision not to deal with Viamedia in 2012.  All lack merit.

*First*, Viamedia claims that Comcast sacrificed short-term profits before it eventually won business from WOW! and RCN (Br. 28-29, 33-34), but that does not

imply that Comcast's decision was anticompetitive.[5]  As then-Judge Gorsuch observed, a firm "might wish to withdraw from a prior course of dealing and suffer a short-term profit loss in order to pursue perfectly procompetitive ends—say, to pursue an innovative replacement product of its own."  *Novell*, 731 F.3d at 1075. The district court expressly relied on this reasoning.  SA66.  As the United States explains, when a defendant's "conduct entails a short-run profit sacrifice," it is "[t]he *plaintiff's burden* . . . to show that the sacrifice makes sense only if the conduct causing it serves to eliminate or lessen competition."  U.S. Br. 12-13 (emphasis added).  Not only did Viamedia fail to plead facts satisfying its burden, it instead pleaded facts demonstrating Comcast's valid business purpose.

*Second*, Viamedia is wrong that the passage of time between Comcast's non-renewal of its Viamedia contract and its direct deals with WOW! and RCN (Br. 34) detracts from Comcast's procompetitive purpose to disintermediate a middleman. The timing resulted from the nature of the market:  ad representatives compete for *exclusive* long-term contracts with MVPDs when they come up for renewal.  A64-65 (¶¶ 72-73).  That competition takes this form does not make Comcast's disintermediation rationale any less procompetitive.  *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) ("[C]ompetition for the

---

[5] Viamedia improperly uses discovery evidence to bolster its refusal to deal theory. Br. 28-31.  But that evidence reflects only that Comcast sacrificed some short-term profit after declining to deal with Viamedia, *id.* at 29-30, and that Comcast's conduct was motivated by its desire to compete for direct relationships with MVPDs, *id.* at 30.  That evidence is redundant of Viamedia's allegations and thus adds nothing to its theory.

contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress.").

Viamedia itself alleged that WOW! and RCN were locked into "longstanding contractual relationships with Viamedia." A71 (¶ 106). And Viamedia acknowledges that its exclusive agreements with WOW! and RCN were, until their expiration, a barrier to Comcast entering into more efficient direct relationships with those MVPDs. Br. 34. Viamedia should not be heard to invoke barriers that Viamedia itself erected as a basis to contend that Comcast's conduct was anticompetitive. In any event, as Viamedia's complaint concedes, Comcast ultimately achieved the procompetitive disintermediation that it pursued.

*Third*, contrary to Viamedia's arguments (Br. 34-35), it is irrelevant whether Comcast *might* have pursued direct relationships with WOW! and RCN without declining to deal with Viamedia. Refusal to deal doctrine does not require a defendant to achieve its procompetitive objectives in the manner that is most accommodating to its rivals. As shown above, a legitimate business purpose ends the antitrust inquiry—there is no "balancing" of harms and benefits. U.S. Br. 15. Viamedia's argument, if accepted, would compel Comcast to share the "source of its advantage" with Viamedia in order to assist Viamedia in *competing directly with Comcast*—a result that would encourage free riding and is contrary to the fundamental objectives of antitrust. *Trinko*, at 407-08 ("Compelling [monopolists] to share the source of their advantage . . . may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.").

30

Moreover, as Viamedia admits, the parties' 2003 agreement prohibited Comcast from soliciting WOW! or RCN until shortly before the agreement expired. Br. 11. It is disingenuous for Viamedia to suggest that Comcast could have renewed that 2003 agreement and pursued direct contractual relationships with WOW! and RCN. Viamedia sought to prohibit precisely that outcome.

*Finally*, Viamedia's attack on the timing of Comcast's decision disregards that the parties' 2003 agreement, under which Viamedia accessed Comcast's Chicago and Detroit interconnects, expired by its own terms on May 31, 2012. Br. 11-12.[6] The antitrust laws do not require firms to renew contracts with rivals in perpetuity—especially where, as here, the contracting parties expressly agreed to a termination date. *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1197-98 (10th Cir. 2009).

## 2. Viamedia's Arguments Raised for the First Time on Appeal Are Also Meritless

Viamedia improperly advances a number of additional arguments for the first time on appeal and attempts to use discovery evidence to challenge the dismissal of its duty to deal theory. This Court should disregard those unpreserved arguments and allegations outside the amended complaint. Contrary to Viamedia's contention (Br. 32 n.7), Viamedia could have moved under Rule 54(b) for reconsideration of the dismissal of its duty to deal theory based on new evidence, but elected not to do so. *Carmody v. Bd. of Trustees of Univ. of Ill.*, 893 F.3d 397, 407-08 (7th Cir. 2018);

---

[6] The Court may consider "concession[s] in [Viamedia's] brief." *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 594 (7th Cir. 2003).

*Cassell v. Michaux*, 240 F.2d 406, 407-08 (D.C. Cir. 1956).  Indeed, Viamedia

expressly "reserve[d] the right to seek reconsideration" of the refusal to deal ruling,

yet never did so.  DA247 n.1.  Viamedia's tactical decision to wait until appeal to use

discovery evidence to challenge the dismissal of its duty to deal claim is

impermissible.  In any event, the new arguments and discovery evidence are

unavailing to Viamedia.

    *First*, Viamedia argues erroneously that Comcast's valid business purpose

involved a "question of fact" that could not be resolved on a Rule 12(b)(6) motion.

Br. 36.  Viamedia not only failed to raise that argument below, but it took the

*opposite* position by asking the district court to decide the issue on the pleadings.

DA35 ("Nor is there any procompetitive justification for Comcast's refusal to deal.");

DA36 ("In short, Comcast's refusal to deal does not offer any rational procompetitive

benefits to Comcast."); DA39 ("Comcast did not accept the Court's invitation to

identify any specific efficiencies . . . ."); DA15 ("Comcast does not even attempt to

offer . . . a [valid business] reason in its brief.").  Viamedia cannot reverse poles on

appeal.  *See Sanchez v. City of Chi.*, 880 F.3d 349, 360 (7th Cir. 2018) ("[A] party

cannot complain of errors which it has committed, invited, induced the court to

make, or to which it consented.") (citation omitted).[7]

    In any event, it was Viamedia's burden to plead facts plausibly showing that

a profit sacrifice "ma[de] sense only if the conduct causing it serves to eliminate or

---

[7] Viamedia's principal argument below was that there was no disintermediation because Comcast and Comcast Spotlight are distinct legal entities.  DA38-40.  On appeal, Viamedia abandons that argument, which the district court properly rejected.  SA68-69.

lessen competition." U.S. Br. 13. Viamedia not only failed to meet this burden, but it instead pleaded facts showing Comcast's valid business purpose. It is well established that a "defendant may use [facts pleaded in the complaint] to demonstrate that [the plaintiff] is not entitled to relief." *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009). That is exactly what Comcast did here. The district court did not require Viamedia to "anticipate and attempt to plead around all potential defenses." Br. 37 (quotation omitted). "If a refusal to deal serves a legitimate business purpose, Section 2 makes no further inquiry into its effects on competition." U.S. Br. 15; *see supra* Point I.B. Thus, Viamedia "plead[ed] [itself] out of court." *Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008); *see Crest Hill Land Dev., LLC v. City of Joliet*, 396 F.3d 801, 805 (7th Cir. 2005) (A judicial admission in a pleading "has the effect of withdrawing the question . . . from contention.").

*Second*, Viamedia argues that Comcast "[s]electively den[ied] interconnect access" to Viamedia by refusing to deal with it on the "same terms" as with "non-competitors." Br. 31. There are a host of flaws with this argument. Viamedia never asserted this argument before the district court and its amended complaint was devoid of facts supporting its new argument, so Viamedia impermissibly relies on "post-complaint evidence." *Id.*; *see Redd*, 663 F.3d at 290 (disregarding allegations not in the dismissed complaint).

In addition, it is entirely reasonable and appropriate that a firm would treat rivals differently from other customers. Section 2 is not some version of the

Robinson-Patman Act. *Trinko* stands for the proposition that forcing a firm to share *with rivals* will reduce incentives to invest and facilitate improper collusion. 540 U.S. at 407-08. These concerns are not presented when a firm enters into a voluntary vertical relationship with a non-competitor customer. Indeed, many cases rejecting refusal to deal claims involve selective non-dealing with rivals. *See, e.g., Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183 (9th Cir. 2016); *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 189-91 (2d Cir. 1992).[8]

Viamedia's argument also highlights the insoluble administrability problems raised by its muddled theories of refusal to deal liability. Viamedia insists that Comcast deals with MVPDs "on terms equivalent to those previously granted to Viamedia," namely "a fee to Comcast averaging approximately ▮% of revenue." Br. 16 (citing A325 (tbl.1)); Br. 32. But the cited "evidence" shows that Comcast's interconnect-only deals with MVPDs have fees ranging from ▮% to ▮% of revenue. A325 (tbl.1).[9] Viamedia suggests that this ▮▮▮ fee range is an appropriate basis for a court to impose on Comcast the same terms that it negotiated with Viamedia *fifteen years ago*, solely because the ▮% fee under the parties' 2003 agreement falls near the middle of the range. That is a classic example of a call for a court to act as "central planner[], identifying the proper price, quantity, and other terms of dealing—a role for which [courts] are ill suited." *Trinko*, 540 U.S. at 408.

---

[8] Anything in *Olympia Equipment* that is arguably inconsistent with this principle is dicta and does not survive *Trinko*.

[9] "Revenue share" is the percentage of revenue paid to the MVPD, so the fee to the ad representative is 100% minus the revenue share.

*Third*, Viamedia's passing references to the "essential facilities" doctrine are unavailing. Br. 27. Viamedia's allegations demonstrate that interconnect access is *not* essential to providing ad representation. For example, Viamedia allegedly participated in interconnects in only five of the "more than 70" DMAs in which it operated. A65, 83-84 (¶¶ 76, 164). And WOW! renewed its agreement with Viamedia in Chicago and Detroit despite Viamedia's lack of interconnect access. Br. 12. In any event, it is doubtful that the "essential facilities" doctrine survived *Trinko*. *See Trinko*, 540 U.S. at 410-11; Areeda ¶ 772d3, at 235; U.S. Br. 11-12 ("The Supreme Court has never adopted the essential facilities doctrine in a Section 2 case," and "the doctrine has been heavily criticized.") (quotations omitted).

### E.    Viamedia's Allegations Establish Additional Grounds for Dismissal

The amended complaint provides additional grounds to affirm dismissal of Viamedia's refusal to deal claim.

*First*, Viamedia's allegations show that, unlike in *Aspen Skiing*, cooperation between Viamedia and Comcast was a limited exception to their overwhelmingly competitive relationship. A prior cooperative relationship is a prerequisite to a duty to deal. *Trinko*, 540 U.S. at 409. But Viamedia pleaded that Comcast consistently *refused* to do business with Viamedia in the "many" DMAs outside Chicago and Detroit in which the parties competed. A51, 66, 73, 76-77 (¶¶ 11, 78, 121, 136-137). And the parties' deal in Chicago and Detroit was limited both geographically and temporally. Br. 11-12. No anticompetitive inference can be drawn from Comcast's

decision to cease a narrow, one-off exception to the parties' competitive relationship. To the contrary, restoring complete competition was procompetitive.

*Second*, Viamedia acknowledged that Comcast actually offered to continue to do business with Viamedia in Chicago and Detroit. A73-74 (¶ 122). In its amended complaint, Viamedia alleged that Comcast's offer contained "commercially unreasonable terms," *id.*, and—as discussed above—its appellate brief likewise complains that Comcast declined to offer "terms equivalent to those that Comcast had previously granted to Viamedia" nearly a decade earlier, Br. 32. Viamedia's arguments underscore that it asked the district court to set "reasonable" commercial terms for Comcast's forced dealing with Viamedia—that is, to act as "central planner[]" in a manner that *Trinko* expressly warns against. *Trinko*, 540 U.S. at 408.

## II.     The District Court Properly Granted Summary Judgment Rejecting Viamedia's Tying Theory

The district court correctly held that the "gravamen" of Viamedia's tying claim is "that Comcast's refusal to provide it interconnect access prevents it from selling the kind of full-turnkey Ad Rep Services that WOW! and RCN desire." SA39. Viamedia cannot evade *Trinko* and its progeny by dressing up its refusal to deal claim as a tying claim. And Viamedia's attempt to force Comcast to supply it with the "tying" product so that Viamedia can bundle it with the "tied" product for sale to MVPDs is "nothing other than a disguised attack [by a less efficient rival] on [Comcast's] vertical integration." Areeda ¶ 1748b, at 246-47.

36

### A.    The District Court Correctly Held that There Was No Unlawful Coercion as a Matter of Law

Viamedia focuses its challenge to the dismissal of its tying claim on the holding that Viamedia had failed to prove the essential element of "conditioning" (or "forcing" or "coercion").  As the court properly held, however, Viamedia cannot prove forcing as to either (1) RCN's and WOW!'s purchase of the "tying" product (Interconnect Services) and "tied" product (Ad Rep Services) from Comcast; or (2) Comcast's withholding of the "tying" product from Viamedia.  SA29-40.

### 1.    Undisputed Evidence of Comcast's Unbundled Sales Shows, as a Matter of Law, that There Was No Forcing

It is undisputed that Comcast *never* denied an MVPD's request to purchase the alleged tying product (Interconnect Services) on a standalone basis, and that "14 percent of Comcast's agreements with MVPDs are interconnect-only."  DA702-03 (¶¶ 123-124).

As the district court held, "[t]hat Comcast has so often entered into such standalone sales of the tying product belies any inference that Comcast tied its services."  SA30; *see It's My Party*, 811 F.3d at 685 (14% standalone sales of the alleged tying product—the same percentage as here—"cast[s] doubt on any allegation of tying"); Areeda ¶ 1756b2, at 334 (reasoning that "more than 10 percent unbundling" rebuts "an otherwise established or presumed inference of a tying condition").

Viamedia attempts to diminish Comcast's interconnect-only deals by arguing that they "were signed in DMAs *other than* Chicago and Detroit with MVPDs other than RCN and WOW!."  Br. 42.  Viamedia is trying to have its cake and eat it too.

Viamedia relied on nationwide evidence to argue that "separate demand" exists for the "tying" and "tied" products.  In fact, it relied on the *same* evidence that shows 14% of Comcast's most recent agreements are interconnect-only.  DA603-04; DA703 (¶ 124); A578 (¶ 67).  Having relied on nationwide evidence for an essential element of its tying theory—i.e., the existence of allegedly separate products in Chicago, Detroit and Hartford—Viamedia should not be heard to insist that the same evidence cannot be used to establish the absence of conditioning in the same DMAs.

## 2. WOW!'s and RCN's Purchases of the Tying and Tied Products from Comcast Did Not Entail Forcing

The district court also correctly concluded that no tying liability arises from WOW!'s and RCN's purchases of the "tying" and "tied" products from Comcast because, as a matter of law, these bundled purchases did not involve conditioning.  It is "undisputed that both RCN and WOW! *wanted* full-turnkey representation, and whichever company they hired had to have the ability to make available to them both Interconnect Services and Ad Rep Services."  SA31; DA684, 688 (¶¶ 90, 99).  Nor is there any dispute that "WOW!, like RCN, never requested an interconnect-only deal from Comcast."  SA13; DA684, 688 (¶¶ 90, 99).

On this basis, the court held that "[w]hen 'a consumer wants to purchase a bundle of the alleged tying and tied products, the seller is simply satisfying consumer demand and monopolization concerns are irrelevant.'"  SA31 (quoting *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016)).  When the consumer itself demands a bundle, there "cannot be coercion."  *Id.*; *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("Buyers often find package sales

attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act.").

In *Kaufman*, the Second Circuit emphasized that this holding applies "even if there are separate product markets." 836 F.3d at 142. Thus, whether *other* buyers have separate demand for the tied and tying products is, at most, relevant to whether they are separate products. *See, e.g., Jefferson Parish*, 466 U.S. at 21-24; *Collins*, 844 F.2d at 477; Br. 46. To show tying, a plaintiff must also demonstrate that the alleged victims of the tying demanded the products separately.

No tying liability can arise when buyers demand a bundle of the tied and tying products from the same seller:

> A tie within the meaning of antitrust depends on showing that the buyer did *not* want to take both products from the same vendor. "[T]here is nothing inherently anticompetitive about packaged sales. Only if [buyers] are forced to purchase [the tied] services as a result of the [seller's] market power would the arrangement have anticompetitive consequences." [*Jefferson Parish*, 466 U.S. at 25.] If the buyer wants both products together—as, for example, the buyer of an automobile wants both chassis and engine together, even though they could be sold separately—there is no forcing, and so there is no tie-in.

*Will*, 776 F.2d at 669. Thus, as a matter of law, there was "no forcing" and "no tie-in" when RCN and WOW! purchased the tying and tied products from Comcast because each "buyer want[ed] both products together." *Id.*

### 3. Comcast's Alleged Refusal to Allow Viamedia's Clients To "Participate in Interconnects" Did Not Entail Forcing

The district court properly held that no tying liability arises from Comcast's alleged "refusal to allow RCN and WOW! to participate in interconnects while they were still under contract with Viamedia." Br. 44. As the court explained, "[t]he real

39

rub of Viamedia's tying claim is . . . that Comcast withheld the tying product *from its rival Viamedia*." SA32.

The court accurately discerned that Viamedia's tying theory rests entirely on Comcast's alleged refusal to deal with Viamedia. *Id*. As Viamedia admits, it was *only* "[b]y terminating its arrangement with Viamedia" that Comcast supposedly "refused to provide [standalone] Interconnect Services to WOW! and RCN." Br. 44-45. In fact, Comcast never refused to provide standalone interconnect access to WOW!, RCN, or Frontier. There is *no* evidence that any of those MVPDs ever wanted to purchase the "tying" and "tied" products other than as a bundle. DA684, 686-87, 690-91 (¶¶ 90, 95, 99, 104); DA718-19 (37:24-38:14). And there is no dispute that while WOW!, RCN, and Frontier were clients of Viamedia, each was locked into an exclusive, full-turnkey agreement with Viamedia that would have precluded it from signing a direct interconnect-only deal with Comcast, even if it had wanted one. DA664-65, 678, 683-84, 687 (¶¶ 49, 73, 88-89, 96); A565 (¶ 38). Thus, any speculation about direct dealings between Comcast and WOW!, RCN, or Frontier while they were exclusively represented by Viamedia is entirely imaginary.

The district court correctly concluded that by conflating refusal to deal with *Viamedia* with tying as to *MVPDs*, "Viamedia's theory extends tying beyond the law's recognition"—as illustrated by the Ninth Circuit's decision in *Aerotec*, and the Fourth Circuit's decision in *Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680 (4th Cir. 1992). SA32.

In *Aerotec*, Honeywell "was a monopolist in the replacement parts market," and competed against independent servicers, including Aerotec, in supplying repair services to airlines. SA33. Aerotec accused Honeywell of making it difficult for independent servicers to obtain parts, and argued these difficulties amounted to an "implicit[] tie[]" of repair services to parts. 836 F.3d at 1179. The Ninth Circuit disagreed, observing that there was "no evidence" that Honeywell conditioned the sale of parts to airlines on repair services. *Id.* The court "decline[d] to stretch the tying construct to accommodate the claim that . . . conduct toward third party servicers . . . acts as an effective, or 'de facto,' condition on sale to airlines." *Id.* at 1178.

Viamedia tries to distinguish *Aerotec* because Honeywell did not condition parts on repair services in direct dealings with airlines, "the relevant consumers." Br. 45. But that "distinction" does nothing to detract from the Ninth Circuit's holding that a monopolist's dealings with *rivals* in a downstream market cannot be the basis of a tying claim as to *customers* in that market. In any event, here "the relevant consumers" were, as Viamedia clients, contractually barred from purchasing the tying product from Comcast, which renders Viamedia's focus on potential interconnect-only deals between its clients and Comcast purely hypothetical.

In *Data General*, some of Data General's computer customers also purchased repair services (the tied product) from Data General, which used a proprietary diagnostic tool (the tying product). The plaintiff, STI, competed with Data General

41

in the repair market, and Data General would not license the diagnostic tool to STI. Data General did, however, license the tool to cooperatives of customers that repaired their own computers. 963 F.2d at 686-87. The Fourth Circuit reasoned that Data General's right under *Colgate* not to license the tool to STI meant that "[t]he fact that Data General has selectively licensed [the tool] is not evidence of an illegal tying arrangement." *Id.* at 686.

Viamedia argues that *Data General* is distinguishable because Data General's repair customers did not license the tool. Br. 47. But the Fourth Circuit concluded there was no conditioning even assuming that, in effect, repair customers did license the tool. 963 F.2d at 687. Viamedia also tries to distinguish *Data General* by arguing there was "no evidence that customers who purchased repair services had any independent demand for the diagnostic tool." Br. 47. But the Fourth Circuit reversed the district court's determination that the diagnostic tool was not a separate product, reasoning that there was sufficient evidence of "two distinct markets" from buyers' perspective to "support a reasonable inference that Data General might 'have foreclosed competition on the merits in a product market distinct from the market for' [diagnostic tool] licenses." 963 F.2d at 684 (quoting *Jefferson Parish*, 466 U.S. at 19, 21).

Viamedia also argues that because there is "distinct demand" for Interconnect Services and Ad Rep Services, the district court erred in analogizing them to aluminum ingot and aluminum wall sections as suggested in the Areeda treatise. Br. 45-46 (citing SA38). That argument misses the point of the analogy,

42

which is that Viamedia, like the plaintiff in the aluminum example, "demands [the tying product] separately 'so that it too can bundle it with [the tied product]'" for sale to consumers.  SA38 (quoting Areeda ¶ 1748a).  Under these circumstances, as Areeda explains, a tying claim is merely a disguised refusal to deal claim, and the existence of separate demand is irrelevant.  SA38-39.

In its only explicit acknowledgement that its arguments rest on a legally unsupported theory that Viamedia was MVPDs' "agent" for tying purposes, Viamedia argues that under *Jefferson Parish*, tying can be effected "indirectly through a representative," because there the tied product (anesthesiological services) was "normally selected by the surgeon, rather than the patient."  Br. 46-47 (quoting *Jefferson Parish*, 466 U.S. at 23) (emphasis omitted).

Viamedia appears to be analogizing MVPDs to patients, itself to a surgeon, Ad Rep Services to anesthesiological services, interconnects to operating rooms (the tying product), and Comcast to the hospital.  Viamedia's analogy fails because there is no "representative" that selects Ad Rep Services on behalf of MVPDs.  Instead, MVPDs directly hire ad representatives, which may or may not have interconnect access.  Viamedia's "agency" theory does not change the fact that it is a seller of the "tied" product that sought to purchase the "tying" product to attempt to compete with Comcast's more attractive offerings.

Further, in *Jefferson Parish*, some patients demanded unbundled anesthesiological services, but the hospital would not provide a standalone operating room to patients *or* their surgeons.  466 U.S. at 23-25.  Here, in contrast,

43

the uncontroverted evidence shows that WOW!, RCN, and Frontier did not demand

unbundled services *and* that Comcast provided interconnect-only deals directly to

MVPDs.

### 4.    Viamedia Failed to Proffer Evidence Probative of Forcing

Viamedia argues that a jury could interpret a handful of evidentiary snippets

as "sufficient proof" of forcing.  Br. 39-40.  The district court properly rejected that

attempt at litigation by sound bite.

*First*, the statements cited by Viamedia cannot, as a matter of law, overcome

the legal obstacles to Viamedia's tying claim.  *Supra* Point II.A.1-3.  For example,

the uncontroverted evidence showed that RCN sought *only* a full-turnkey deal in

Chicago, which precludes any finding of conditioning—rendering irrelevant RCN's

supposed understanding that Comcast would offer only a full-turnkey deal.  By

analogy, there is no conditioning when an automobile buyer "wants both chassis

and engine together," even if the buyer understands that the dealer could, but will

not, sell them separately.  *Will*, 776 F.2d at 669.

*Second*, each of the statements describes lawful behavior, including

(1) Comcast's disintermediation of Viamedia, which required MVPDs to hire

Comcast to obtain the "tying" product (Interconnect Services) *even on a standalone*

*basis*; or (2) the demand by some MVPDs, including WOW! and RCN, for the alleged

tying and tied products *only* on a bundled basis.  For example, *because* RCN

demanded only full-turnkey representation, Comcast's disintermediation of

Viamedia meant that RCN had to deal with Comcast "instead of" Viamedia to obtain interconnect access. Br. 39.

Viamedia attempts to exploit the confusion created by its own overlapping definitions of the "tying" and "tied" products. It is undisputed that (1) an MVPD obtains standalone Interconnect Services pursuant to an interconnect-only agreement with Comcast (*see supra* at 12, 16), and (2) Interconnect Services necessarily include ad sales services that overlap significantly with Viamedia's gerrymandered definition of "Ad Rep Services" (DA82-84 (137:13-142:7, 144:14-146:4)). In this context, testimony that an MVPD seeking interconnect access "has to hire Comcast as its ad sales representative" (Br. 39) is not probative of tying. Viamedia's contrary argument is pure semantics.

Viamedia also removes statements from context to argue that the statements are sufficiently ambiguous to support an inference of forcing. But a triable issue exists only when a reasonable jury could find for the non-moving party "based on the record as a whole," and not based on out-of-context evidentiary fragments. *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994).

Viamedia bore the burden of proving that Comcast "condition[ed] MVPDs' access to Interconnects on their acceptance of Comcast Spotlight's representation services even for advertising sales *that are unrelated to the use of the Interconnects*." SA108 (emphasis added). Despite obtaining documents and deposing witnesses from Comcast, WOW! and RCN, Viamedia does not have any evidence that satisfies this burden. To the contrary, witnesses from both WOW! and RCN testified that

45

████ ████████    ██████████████████████████ DA361-62 (136:6-

137:4); DA429 (169:21-24). Thus, the district court did not need to draw any

inference in favor of Comcast to conclude that Viamedia's proffered evidence failed

to create a triable issue as to forcing. SA35-36.

*Third*, although the Court need not reach this issue, Viamedia bore the

burden on summary judgment of proffering evidence that "tends to exclude the

possibility that [Comcast's] conduct was as consistent with competition as with

illegal conduct," which Viamedia also failed to do. *Mercatus Grp.*, 641 F.3d at 856

(citation omitted). Viamedia argues, in passing, that the "tends to exclude"

standard is inapplicable beyond Section 1 cases alleging conspiratorial agreement.

Br. 24. Viamedia is wrong. *Mercatus Grp.*, 641 F.3d at 856; *O.K. Sand & Gravel,

Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 574 (7th Cir. 1994); *Ind. Grocery*,

864 F.2d at 1412-13. In any event, Viamedia acknowledges the district court's

recognition that there is no "heightened" summary judgment standard in antitrust

cases, and makes no attempt to implicate the "tends to exclude" standard in any

supposedly incorrect outcome in this case. Br. 24. Thus, Viamedia has failed to

properly challenge the district court's correct application of that standard here.

### B.    The Absence of Foreclosure Is, as a Matter Of Law, Fatal to Viamedia's Tying Claim

Viamedia's theory that withholding the tying product from Viamedia itself

violated Section 2 fails for an independent reason: there is no anticompetitive

foreclosure, which is an essential element of a tying claim.

The "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product *to force the buyer into the purchase of a tied product* that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."  SA29 (quoting *Jefferson Parish*, 466 U.S. at 12) (emphasis added).  Absent a sale of the tied product, there is no tie.  *See*, *e.g.*, *It's My Party*, 811 F.3d at 684 ("If . . . the buyer is free to decline the tied product . . ., then by definition there is no unlawful tying."); Areeda ¶ 1753e, at 311 n.30 ("[A] contract requiring the customer to take B if it chooses to buy A does not itself constitute a *tying* agreement *until the customer does buy something*.") (emphasis added).

The requirement of a forced sale of the "tied" good applies to Section 2 tying claims.  *See*, *e.g.*, *It's My Party*, 811 F.3d at 684; *Trans Sport*, 964 F.2d at 192.  This follows from the fundamental principle that tying is potentially actionable only to the extent it causes *foreclosure*.  *See*, *e.g.*, *Jefferson Parish*, 466 U.S. at 21 (tying liability depends on "whether there is a possibility that the economic effect of the arrangement" is to "foreclos[e] competition on the merits in a product market distinct from the market for the tying item"); *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006) (affirming the dismissal of a tying claim absent foreclosure); Areeda ¶ 1753f, at 312 (the nonexistence of tying liability absent a sale of the tied product "reflects the absence of any relevant foreclosure").

Thus, "[t]he harm from tying arrangements is the forced sale of the tied product, *not the withholding of the tying product*."  SA30 (quoting *Datagate, Inc. v.*

*Hewlett-Packard Co.*, 60 F.3d 1421, 1427 (9th Cir. 1995)) (emphasis altered).

Viamedia conceded this critical legal principle below. DA255 (quoting *Datagate* for

this holding).

When Comcast allegedly withheld Interconnect Services from Viamedia while

Viamedia represented WOW! and RCN in Detroit and Chicago and Frontier in

Hartford, there was *no* forced sale of Ad Rep Services by Comcast—either to

Viamedia or to any of its MVPD clients. Nor was there any foreclosure, because

each of the MVPDs were, in fact, purchasing the tied product from Viamedia. Thus,

as a matter of law, there cannot be any tying liability.

Although Comcast did sell the "tied" product to RCN and WOW! after 2015,

RCN's and WOW!'s failure to buy the "tied" product from Viamedia resulted from

Comcast's more favorable terms—which is competition not anticompetitive

foreclosure. *See infra* Point IV.B. In any event, the uncontroverted evidence shows

that there was no conditioning in connection with Comcast's deals with WOW! and

RCN. *See supra* Point II.A.

## III.    <u>Viamedia Lacks a Viable "Free-Standing" Section 2 Claim</u>

The district court correctly held that Viamedia's "free-standing" Section 2

claim—untethered from unlawful refusals to deal and tying—is procedurally barred

and meritless. SA47-48.

The court held that Viamedia was judicially estopped from asserting the

claim because Viamedia, in opposing dismissal of its complaint, had "affirmatively

disavowed any 'free-standing' monopolization claim 'unaccompanied by . . . 'any of

the normal exclusionary practices.'" SA47 (quoting DA27). Viamedia now tries to

rewrite "normal exclusionary practices" to mean any "anticompetitive conduct," and insists that it disavowed only a claim "in the *absence* of anticompetitive conduct." Br. 48. But Viamedia's disavowal expressly identified "the normal exclusionary practices" as "tie-in sales (or another form of bundling), group boycotts, exclusive dealing and selective refusal to deal, or predatory pricing." DA27 (quoting *Schor*, 457 F.3d at 610-11); *see also* DA28 (invoking "the Complaint's straightforward tying and exclusive dealing theories" to distinguish this Court's rejection of a "free-standing" Section 2 claim in *Schor*).

Thus, the court's determination that Viamedia disavowed a Section 2 claim untethered from its refusal to deal, tying and exclusive dealing theories was correct, and its judicial estoppel reasoning remains unchallenged. *See*, *e.g.*, *e360 Insight v. Spamhaus Project*, 500 F.3d 594, 599 (7th Cir. 2007) (factual determinations underlying waiver findings are reviewed for "clear error").

In any event, Viamedia's "free-standing" claim fails because its contention that Comcast's conduct was anticompetitive "for all of the reasons tying is anticompetitive" (Br. 47) suffers from the same problem as its tying claim—it depends entirely on Comcast's lawful refusal to deal with Viamedia.

Separately, amicus American Antitrust Institute ("AAI") criticizes the district court for "[i]mproperly [d]isaggregat[ing]" Viamedia's refusal to deal and tying theories, and "considering the [theories] independently." AAI Br. 22-23. Contrary to AAI's contention, however, the court carefully considered the theories together and correctly determined that Viamedia could not prove the "distinct" tying theory

49

that had survived the motion to dismiss, and that the "tying" Viamedia tried to prove was indistinguishable from the dismissed refusal to deal. SA108-09 & n.9; SA36-37.

## IV. The District Court Properly Held that There Was No Evidence that Any Anticompetitive Conduct Caused Antitrust Injury or Damages

"The antitrust laws . . . were enacted for the protection of competition not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quotation omitted). There can be no antitrust injury or damages here because there was no harm to competition. *Id.* at 489. The uncontroverted evidence showed that Comcast lowered prices throughout the relevant period. DA700 (¶ 121). And, as the district court observed, there was no "evidence showing that Comcast has raised, plans to raise, or even has the ability to raise prices," or that "Comcast has reduced or plans to reduce output." SA44.

As shown below, Viamedia cannot show a triable issue as to causation of antitrust injury or damages. This is an independent basis for the dismissal of Viamedia's tying claim. *See Dalton v. Teva N. Am.*, 891 F.3d 687, 691 (7th Cir. 2018); *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 717-18 (7th Cir. 2006).

## A. Viamedia Cannot Establish Antitrust Injury because Its Harm Flowed from Comcast's Lawful Refusal to Deal

The district court correctly concluded that Viamedia did not raise a triable issue "as to whether its alleged antitrust injuries resulted from . . . anticompetitive conduct as opposed to Comcast's . . . legal refusal to deal." SA50. Antitrust injury cannot arise from lawful conduct, and "each injury Viamedia identifies . . . is fully

50

attributable to Comcast's [lawful] decision to deny Viamedia interconnect access."
SA50-52. In fact, Viamedia's expert witnesses and its CEO conceded that its
injuries flowed from its inability to access Comcast's interconnects. A233 (¶ 90);
A596-99 (¶ 34); DA191 (235:18-236:20); A706, 711-16 (¶¶ 14, 36-38, 42).

Viamedia contends that it was injured by unlawful tying, and "it does not
matter" that the same underlying conduct "did not violate any separate duty to
deal." Br. 51. But Viamedia cites no authority for that argument, which is contrary
to law. *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("If
a plaintiff has suffered financial loss from the *lawful* activities of a competitor, then
no damages may be recovered under the antitrust laws."); *In re Publ'n Paper
Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012) ("[An antitrust] plaintiff must
establish that the injuries alleged would not have occurred but for the defendant's
antitrust violation, adding necessity to the materiality requirement of our antitrust
causation analysis.") (quotation omitted); ABA Section of Antitrust Law, *Proving
Antitrust Damages: Legal and Economic Issues* 10 (3d ed. 2017) ("*Proving Antitrust
Damages*") ("[T]here can be no contribution to the injury, much less a material one,
if the same injury would have occurred in the absence of the violation.").

Viamedia baselessly challenges the district court's reliance on *Novell*. Novell
asserted claims for refusal to deal and anticompetitive deception. *See Novell*, 731
F.3d at 1079-80. The Tenth Circuit concluded that the deception claim could not
survive the rejection of the duty to deal claim. Novell could not establish antitrust
injury because, as a result of the lawful refusal to deal, Novell "*still* would have

51

suffered the same alleged harm" absent the anticompetitive "deception." *Id*. at 1080.  In an attempt to distinguish *Novell*, Viamedia argues that Novell's harm "was caused by the [defendant's] withdrawal of the software modules and *not* by the deception."  Br. 52.  But that is not a distinction because, as Judge St. Eve correctly held, "Viamedia's own evidence decisively establishes that Comcast's refusal to deal was sufficient unto itself to cause Viamedia's injuries."  SA52; *see* SA50-51 (quoting admissions by Viamedia's witnesses).

## B.     Viamedia's Inability to Compete with Comcast Cannot Cause Antitrust Injury

Viamedia's proffered liability expert opined that Comcast's interconnects give it a "formidable competitive advantage" because they allow Comcast "to offer financial terms to MVPDs that are much more generous than any terms Viamedia could feasibly (much less profitably) offer."  A231 (¶ 87); Br. 14 (offering WOW! "access to the interconnects in Chicago and Detroit" gave Comcast a "financial advantage").

But Viamedia's inability to compete against Comcast's non-predatory, lower prices cannot cause antitrust injury.  The uncontroverted evidence shows that Comcast consistently lowered its prices.  DA700 (¶ 121); DA274-75 (¶ 7 & fig.1).  Comcast's offers to WOW! and RCN were financially superior to Viamedia's when they switched to Comcast.  DA684, 688 (¶¶ 91, 99).  And Viamedia concedes it was unable to compete with Comcast on price.  A231 (¶ 87).  Indeed, Viamedia's former CFO testified that ██████████████████████████████████████

█████████████████████████████████████. DA463-

64 (92:14-93:19).

As a matter of law, a competitor cannot show antitrust injury based on the

defendant's lower, non-predatory prices. *See Brooke Grp. Ltd. v. Brown &*

*Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993); *Atl. Richfield Co. v. USA*

*Petroleum Co.*, 495 U.S. 328, 337, 339-41 (1990); *Midwest Gas Servs., Inc. v. Ind.*

*Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003).[10]

### C.    Viamedia Cannot Establish Cognizable Damages Because It Failed to Isolate the Effect of Unlawful Conduct

The district court correctly concluded that Viamedia proffered no evidence

from which a reasonable jury could award Viamedia any damages, because

Viamedia "fail[ed] to disaggregate the damages caused by Comcast's lawful refusal

to deal from Comcast's supposed tying, exclusive dealing, and other exclusionary

conduct."  SA54.

Viamedia argues that the court erred by requiring Viamedia "to show that

[its] damages did *not* result from a supposedly lawful refusal to deal."  Br. 51.  As

the court observed, however, Viamedia's proffered evidence affirmatively showed

that its damages *did* result from Comcast's lawful refusal to deal.  SA54 (quoting,

for example, Viamedia's damages expert's admission that "his 'entire damages

estimate is based directly or indirectly on Viamedia's lack of access' to the

interconnects in Chicago, Detroit, and Hartford").

---

[10] Viamedia does not dispute that "no evidence shows that Comcast ever predatorily priced—or even sold below cost—its services."  SA39 n.15.

To the extent Viamedia is arguing that its damages (somehow) also resulted from unlawful conduct, then—contrary to Viamedia's argument (Br. 51)—it had an obligation to disaggregate "damages caused by unlawful tying" from damages caused by lawful conduct. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (antitrust plaintiffs are "entitled only to damages resulting from" an actionable "theory of antitrust impact," so calculations of damages must be tied to each theory of impact); *MCI*, 708 F.2d at 1162 ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage."); *Proving Antitrust Damages* 13-14 ("[C]ourts require that the antitrust violation be the sole cause of the plaintiff's damages, by insisting on a but-for world that eliminates only the defendant's unlawful conduct separately from all other sources that may also have caused the plaintiff's damages.").

## V.  The District Court Did Not Abuse Its Discretion by Excluding Viamedia's Proffered Experts

### A.  The District Court Properly Excluded Lys's Opinions

The district court excluded Lys's opinions in their entirety because they "rest[ed] on the unfounded assumption that Viamedia could have accessed the interconnects but for Comcast's anticompetitive conduct." SA55. Viamedia's challenge to that ruling rests entirely on its argument that the court erroneously ruled that Comcast's refusal to deal was lawful. Br. 55-56. Because the court properly dismissed Viamedia's refusal to deal claim, it did not abuse its discretion in excluding Lys's opinions.

In any event, the exclusion of Lys's opinions is supported by three independent grounds. *First*, Lys improperly assumed in his "but-for" world that Viamedia would have access to the interconnects "as it had before 2011." SA55. Lys had no basis to assume that interconnect access would have been on the terms of the 2003 agreement. Lys conceded that the market terms could have changed between 2003 and 2012, yet he did not analyze that possibility. DA183 (202:16-203:11). Lys's "unfounded assumption" is fatal to his damages model. SA55.

*Second*, Lys's opinions are inadmissible because they rest on unfounded causation assumptions "provided by Viamedia's management." SA22. Expert opinions that rest on unverified statements of management should be excluded. *See, e.g.*, *SMS Sys. Maint. Servs., Inc. v. Dig. Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999); *Ask Chems. LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014).

*Third*, Lys failed to address real-world evidence undermining his causation assumptions. For example, as the district court held, "Viamedia bears the burden of demonstrating that it would have won Verizon's business but-for Comcast's conduct." DA582. In fact, roughly half of Lys's damages estimate depends upon lost Verizon business, but he failed completely to account for a provision in the relevant Verizon agreement that refuted his theory of causation and "upend[ed] important parts of Viamedia's causation and damages cases." DA581; *see* DA239 (427:13-428:16); DA672-74 (¶¶ 61, 64); DA771-72 (¶ 50(a)-(b)).

**B.    The District Court Properly
Excluded Furchtgott-Roth's Opinions**

Both justifications for the district court's exclusion of Furchtgott-Roth's testimony were sound. *First*, the court correctly concluded that his testimony entailed a lay interpretation of evidence. Viamedia argues that his specialized knowledge would assist the jury. Br. 54-55. In his excluded opinions, however, Furchtgott-Roth did nothing more than cite record evidence, rephrase it, and attach a legal conclusion. SA40-41. That is not a proper role for an expert. *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1340 (7th Cir. 1989).

*Second*, the court rightly determined that Furchtgott-Roth's opinions misstated the law. Furchtgott-Roth sought to hold Comcast liable for tying, even when there was no sale of the "tied" product from Comcast. SA42-43; s*ee, e.g.*, A215 (¶ 63) (defining "tying" as "any requirement that two separate products be bought or sold in some combination"). Tying liability requires, as a matter of law, a forced sale of the tied product. *Supra* Point II.B. Furchtgott-Roth's definition of tying therefore failed to distinguish between lawful and unlawful conduct. Thus, the court properly concluded that his tying opinions were unreliable. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1323 (11th Cir. 2003).

## **CONCLUSION**

For the foregoing reasons, Comcast respectfully requests that this Court affirm the judgment.

Respectfully submitted,

/s/ Arthur J. Burke
Arthur J. Burke (*Counsel of Record*)
David B. Toscano
Christopher P. Lynch
John M. Briggs
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Arthur.Burke@davispolk.com
David.Toscano@davispolk.com
Christopher.Lynch@davispolk.com
John.Briggs@davispolk.com

Ross B. Bricker
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
rbricker@jenner.com

*Attorneys for Defendants-Appellees
Comcast Corporation and Comcast Cable
Communications Management, LLC*

December 10, 2018

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that the foregoing brief complies with Circuit Rule 32(c), because the brief contains 13,995 words, including footnotes and the image on page 10, which counsel has determined contains 69 words, and excluding the parts exempted by Rule 32(f). I further certify that this brief complies with the typeface and type style requirements of Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 and is set in Century Schoolbook, 12-point font in the body of the brief and 11-point font in the footnotes.

/s/ Arthur J. Burke
Arthur J. Burke

December 10, 2018

## CERTIFICATE OF SERVICE

I hereby certify that, on December 10, 2018, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Arthur J. Burke
Arthur J. Burke

December 10, 2018